## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Mark A. Thoma
Deputy Public Defender
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
## COURT OF APPEALS OF INDIANA

Angela M. Beck,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 12, 2015

Court of Appeals Case No.
02A05-1410-CR-497

Appeal from the Allen Superior Court

Honorable Frances C. Gull, Judge

Cause No. 02D06-1309-FB-172

**Friedlander, Judge.**

[1] Angela Beck appeals the sentence she received following her conviction of Neglect of a Dependent Resulting in Serious Bodily Injury,[1] a class B felony. Beck contends on appeal that her fifteen-year sentence is inappropriate in light of the nature of her offense and her character.

[2] We affirm.

[3] As a result of Beck's daily methadone use, her son, L.B., was born on February 1, 2012 with methadone in his system. L.B. joined an older sister and an older brother, who were approximately ten and twelve years old, respectively, at the time. Beck also used Adderall, Xanax, and cocaine. After taking this combination of drugs, Beck would be awake for two or three days at a time, and then sleep the next two or three days.

[4] Nicole Conn babysat for Beck. Although she would agree to watch the children "for a few hours", Conn would often be required to stay much longer because Conn "didn't hear from [Beck] and she didn't show up." *Transcript* at 291. It was not uncommon for Conn to stay for "a couple days", and once she stayed eleven or twelve days consecutively. *Id.* at 293. Early in 2013, Conn began noticing injuries on L.B. The first was a large bruise on his face, which Conn

---

[1] The version of the governing statute, i.e., Ind. Code Ann. § 35-46-1-4(b)(2) (West, Westlaw 2013) in effect at the time this offense was committed classified it as a class B felony. This statute has since been revised and in its current form reclassifies this as a Level 3 felony. *See* I.C. 35-46-1-4(b)(2) (West, Westlaw current with legislation of the 2015 First Regular Session of the 119th General Assembly effective through April 23, 2015). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id.* Because this offense was committed before then, it retains the former classification.

described as larger than a softball. After she observed the first large bruise, Conn observed that L.B. had a different injury every time she saw him. These injuries included bruises to his nose, toenail, scrotum, and lip. Conn eventually made an anonymous phone call to the Department of Child Services (DCS) and reported what she had seen. At about the same time, Lynne Riddle, a babysitter for Charissa Vela, a neighbor of Beck's, noticed that Beck left L.B. unattended outside on her back porch in a stroller for between twenty-five and forty-five minutes. L.B. cried during that time, but no one responded. According to Vela, she often would see L.B. left in the backyard either by himself or with children for periods of time. On occasion, she observed that he was left outside in cool weather without adequate protection from the cold. One time, she saw him with "a bruise that took up the whole top right part of his head." *Id.* at 280. When Vela asked L.B.'s sister how he sustained the bruise, she was told that he fell.

[5]     Gregory Higgins lived with and had a romantic relationship with Beck between March and May 2013. On one occasion during that time, Higgins discovered Beck passed out and L.B. outside on the porch alone in a stroller. On another occasion, Higgins happened to walk by the bathroom while Beck was giving L.B. bath. He saw L.B. in the bathtub and Beck sitting on the floor, apparently asleep.[2] Higgins once observed Beck squeeze L.B. until his face became red.

---

[2] Higgins described it as follows: "[Beck] was givin' him a bath. I just happened to be walkin' by … and she nods out. She just kind of leaned down like this a little bit, moves back and forth, I just observe that happening so I woke her up." *Id.* at 63.

According to Higgins, Beck would "fairly frequently" give L.B. "a lot" of cold medicine in order to put him to sleep. *Id.* at 68 and 67, respectively.

[6] On May 9, 2013, Higgins and Beck left L.B. at home with the older children at approximately 10:00 p.m. They stayed out all night, with Beck taking Adderall to stay awake. They returned home around 5:00 or 6:00 a.m. on May 10. Several hours later, Higgins took L.B. upstairs and set him on the floor. As Higgins began to dress, he fell asleep. When he awoke, he noted that L.B. was not in the room and the baby gate was not up. He found L.B. unconscious on the landing of the stairway. Higgins picked up L.B. and took him outside to Beck. Beck took him to the emergency room at St. Joseph's Hospital, where nurse Melissa Holley described him as "floppy and unresponsive, barely breathing", with bruising on his forehead and around his eyes. *Id.* at 42. Beck told Holley that she had left L.B. in Higgins's care and gone outside to work. When Beck returned into the house she found L.B. unresponsive at the foot of the stairs and Higgins was asleep. A CT scan revealed that L.B. had a "head bleed". *Id.* at 45. L.B. was intubated and sedated and, because of the severity of his condition, he was transported to Lutheran Children's Hospital. While in the ambulance, Beck called Conn and, in a whisper, asked if Conn would claim she watched L.B. the night before.

[7] L.B. was admitted to the pediatric intensive care unit. Dr. David Smith was called to consult. When he arrived, Dr. Smith found L.B. paralyzed and on a ventilator. He was in a "very profound and deep coma". *Id.* at 116. The doctor observed that L.B. had suffered "extensive" head and facial trauma. *Id.*

at 101. He had a large bruise above the bridge of his nose and clusters of bruises on his left and right scalp that were older than the other bruises. Dr. Smith explained that based upon the size and location of those clusters of bruises, "it looked like he had probably been grabbed with two hands very tight and squeezed." *Id.* at 102. Dr. Smith also noted that L.B. had a bruised left toe, an abrasion to the left eye, bruises on his lower back, and an injury to the inside of his mouth. L.B. had also sustained two internal injuries, including retinal hemorrhages and blood in the space around his brain. According to Dr. Smith, it was very unlikely that these injuries were caused by falling down three carpeted stairs. As he described it, "he'd have to fall multiple times in multiple places and multiple directions and upside down and backwards and it just doesn't make sense." *Id.* at 114. Instead, the doctor opined that the injuries were caused by "multiple blows to the body from either hand or fingers or some other object [.]" *Id.* at 113. Dr. Terra Harris, a child-abuse pediatrician, testified that L.B.'s brain injury was the result of his head being subjected to "a violent amount of force". *Id.* at 161.

[8] Beck was charged with neglect of a dependent, as a class B felony. She was convicted following a jury trial and sentenced to fifteen years imprisonment. She appeals the sentence imposed.

[9] Beck contends that her sentence is inappropriate in light of the nature of her offense and her character. Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274 (Ind. 2014), *cert. denied*, 135 S.Ct. 978 (2015).

Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). Beck bears the burden on appeal of persuading us that her sentence is inappropriate. *Conley v. State*, 972 N.E.2d 864.

[10] The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell v. State,* 895 N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp v. State*, 9 N.E.3d 1274. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original). Our Supreme Court has indicated that when analyzing the appropriateness of a criminal sentence, there is "no right answer ... in any given case." *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014) (quoting *Cardwell v. State,*

895 N.E.2d at 1224). Rather, appellate review and, where appropriate, revision "ultimately boils down to the appellate court's 'collective sense of what is appropriate, not a product of a deductive reasoning process.'" *Id.* (quoting *Cardwell v. State*, 895 N.E.2d at 1225).

[11] In order to assess the appropriateness of a sentence, we first look to the statutory range established for the classification of the relevant offense. Beck was convicted of a class B felony – neglect of a dependent. The advisory sentence for a class B felony is ten years, with the minimum and maximum sentence being six and twenty years, respectively. Beck was sentenced to a term enhanced by five years beyond the advisory, but five years short of the maximum.

[12] We begin with an examination of Beck's character. Beck points to testimony and letters submitted by friends and family who asserted that Beck wants the best for her children. Although acknowledging that Beck is not perfect and has made bad choices, her friends and family shared their belief that Beck is remorseful about the injuries sustained by L.B. and regard her as a loving and caring mother. We cannot help but note, however, the stark difference between these characterizations of Beck's maternal instincts and the neglectful and sometimes brutal way in which infant L.B. was treated while in her care. Moreover, we note that Beck has a criminal history that includes four misdemeanor convictions and one felony conviction for child endangerment. There also was a plethora of evidence indicating that Beck has a serious substance-abuse problem and that while under the influence of controlled

substances, Beck is frequently unconscious and thus incapable of taking care of her children. She also was unexpectedly absent from the home for long periods of time, thereby foisting the duty of caring for her children upon Conn. Yet, Beck refused to stop taking methadone long enough to participate in substance-abuse treatment that was offered to her. Finally, a member of the Fort Wayne Police Department heard Beck say on one occasion when her children were being removed from her that she did not care because it would give her a break. According to the officer, "she was more concerned about her prescription pills and drugs that … we had confiscated [.]" *Transcript* at 201.

[13] We turn now to the nature of the offense. L.B.'s injuries, as described by his treating physicians and depicted in photos included in the record, bespeak brutal treatment that was not confined to a single episode. Higgins once saw Beck abusing L.B. in a manner consistent with the injuries to L.B.'s head as described by Dr. Smith. There was also evidence that Beck regularly left the infant unattended outside for inappropriate amounts of time, and that she drugged L.B. on a regular basis in order to get him to sleep. In view of the above, we are not persuaded that the fifteen-year sentence is inappropriate.

[14] Judgment affirmed.

Baker, J., and Najam, J., concur.